**STATE v. POOLE**

[228 N.C. App. 248 (2013)]

STATE OF NORTH CAROLINA
v.
TRACY ALLEN POOLE, Defendant

No. COA12-1150

Filed 2 July 2013

1. **Domestic violence—ex parte order—protective order—owning, possessing, purchasing, or receiving a firearm**

     The trial court erred by granting defendant's motion to dismiss the charge of owning, possessing, purchasing, or receiving a firearm in violation of a domestic violence protective order pursuant to N.C.G.S. § 14-269.8 (2011). The trial court erred in relying on *State v. Byrd*, 363 N.C. 214, 675 S.E.2d 323 (2009), because a protective order includes an *ex parte* or emergency order for purposes of N.C.G.S. §§ 14-269.8 and 50B-3.1.

2. **Constitutional Law—due process—prosecution for violation of ex parte order**

     The trial court erred by granting defendant's motion to dismiss the charge of owning, possessing, purchasing, or receiving a firearm in violation of a domestic violence protective order pursuant to N.C.G.S. § 14-269.8 (2011). Prosecution of defendant for violation of an ex parte domestic violence protective order would not infringe his right to due process of law under the state and federal constitutions as these provisions fully comply with procedural due process requirements as applied to defendant.

     Appeal by the State from Order entered 5 June 2012 by Judge Gary M. Gavenus in Superior Court, Buncombe County. Heard in the Court of Appeals 28 March 2013.

     *Attorney General Roy A. Cooper III, by Assistant Attorney General LaToya B. Powell, for the State.*

     *Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Andrew DeSimone, for defendant-appellee.*

STROUD, Judge.

     The State appeals from an order entered 5 June 2012 dismissing an indictment charging Tracy Allen Poole ("defendant") with violating an

*ex parte* domestic violence protective order (DVPO) that required him to surrender his firearms. We conclude that the Supreme Court case relied upon by the trial court is not controlling on the issue presented here because of subsequent statutory amendments and that prosecution of defendant for violation of an *ex parte* order does not violate his procedural due process rights. Therefore, we reverse the trial court's order and remand for further proceedings.

## I. Background

On 14 October 2011, defendant's wife, Tammy Lynn Poole, filed a complaint and motion for a domestic violence protective order, alleging that defendant had showed up at her house after making repeated phone calls and banged on her door. She further alleged that defendant possessed "several rifles and a handgun and lots of ammo" and that she felt "unsafe" and "frightened."

That same day, the trial court entered an *ex parte* DVPO. The trial court found that defendant had placed Tammy in fear of imminent bodily harm and continued harassment "to such a level as to inflict substantial emotional distress." The trial court also found that defendant had threatened to commit suicide. The trial court accordingly concluded that defendant had committed acts of domestic violence, that there "is a clear danger" of acts of domestic violence against Tammy, and that "[t]he defendant's conduct requires that he[] surrender all firearms, ammunition, and gun permits." The *ex parte* DVPO prohibited defendant from contacting Tammy and ordered defendant to surrender all "firearms, ammunition, and gun permits" to the sheriff who served him with the DVPO. The DVPO was in effect until 20 October 2011.[1]

On 17 October 2011 a sheriff served defendant with the DVPO. The next day, 18 October 2011, sheriffs returned to defendant's home and discovered a shotgun. Defendant was then arrested for violating the DVPO and indicted for "owning, possessing, purchasing, or receiving a firearm" in violation of a domestic violence protective order pursuant to N.C. Gen. Stat. § 14-269.8 (2011).

Defendant's case came on for trial on 21 May 2012. Prior to trial, defendant filed a motion to dismiss the charge, arguing that "[a]n ex parte hearing does not satisfy the hearing requirements for a valid protective

---

1. The record before the court does not include any order entered in the domestic violence action after the *ex parte* order, but the parties indicated at the 21 May 2012 hearing on defendant's motion to dismiss that there was still a valid protective order in effect at the time of the hearing.

order" and that "[a] valid protective order is required under N.C.G.S. §§ 50B-3.1(j) and 14-269.8 to convict a defendant of the offense [charged.]" At the hearing on defendant's motion to dismiss the trial court announced that it would grant the motion. On 5 June 2012, the trial court entered an order granting defendant's motion and dismissing all charges because (1) the DVPO "was not a protective order entered within the meaning of N.C.G.S. § 50B-1(c) and N.C.G.S. § 14-269.8" and (2) "prosecution of the defendant . . . under these facts and circumstances would be a violation of the defendant's constitutional right to due process." The State filed timely written notice of appeal to this Court.

## II. Protective order

**[1]** The trial court relied primarily upon *State v. Byrd*, 363 N.C. 214, 675 S.E.2d 323 (2009), in concluding that an *ex parte* order entered under N.C. Gen. Stat. §§ 50B-2(c) and 50B-3.1(b) (2011) is not a "protective order" for purposes of N.C. Gen. Stat. § 14-269.8 (2011). In *Byrd*, the Supreme Court considered whether a Temporary Restraining Order (TRO) entered under N.C. Gen. Stat. § 1A-1, Rule 65, was a "valid domestic violence protective order under Chapter 50B" for purposes of a sentencing enhancement under N.C. Gen. Stat. § 50B-4.1(d). *Byrd*, 363 N.C. at 219, 675 S.E.2d at 325. The Supreme Court held that the TRO was not entered "pursuant to Chapter 50B" and then went on to note that even if it had been entered pursuant to Chapter 50B that it was not a "valid protective order" because it had been entered *ex parte. Id.* at 220-21, 675 S.E.2d at 327.

Here, the trial court concluded that the 2009 amendments to N.C. Gen. Stat. § 50B-4 and 50B-4.1 (2011), which appear to have been passed directly in response to *Byrd*, were inapplicable and that there is a distinction in Chapter 50B between a "protective order" and a "valid protective order." We disagree.

The amendments enacted by 2009 N.C. Sess. Laws 342 do change the application of these statutes and have corrected the situation created by *Byrd*, which left victims of domestic violence with limited penalties for violation of *ex parte* domestic violence orders. The 2009 amendments make it clear that an ex parte domestic violence order entered under Chapter 50B is a "valid protective order" and thus defendant would have been in violation of a "valid protective order" by his alleged possession of guns from 17 October 2011 to about 19 October 2011. Reading N.C. Gen. Stat. § 14-269.8 in light of the plain language of its companion 50B statute, N.C. Gen. Stat. § 50B-3.1, also supports this conclusion.

First, the portions of *Byrd* which the trial court relied on in making a distinction between a "protective order" and a "valid protective order" were *dicta*, as they were not necessary to the court's decision. *See Romulus v. Romulus*, ___ N.C. App. ___, ___, 715 S.E.2d 308, 321 (2011) ("[I]f the statement in the opinion was . . . superfluous and not needed for the full determination of the case, it is not entitled to be accounted a precedent, for the reason that it was, so to speak, rendered without jurisdiction or at least extra-judicial." (quoting *Hayes v. Wilmington*, 243 N.C. 525, 536–37, 91 S.E.2d 673, 682 (1956))).

The Supreme Court in *Byrd* held that a Rule 65 TRO was not sufficient to form the basis of a sentencing enhancement based on violation of a DVPO, since the TRO was not a DVPO entered under Chapter 50B. *Byrd*, 363 N.C. at 218-22, 675 S.E.2d at 325-27. The Court highlighted the significant procedural differences between a TRO under Rule 65 and a DVPO under Chapter 50B.

In addition to those procedural differences which were most relevant in the context of the *Byrd* case—discussed further below—Chapter 50B provides different enforcement mechanisms for DVPOs than are available for Rule 65 TROs. For example, N.C. Gen. Stat. § 50B-3(d) requires that

> The sheriff of the county where a domestic violence order is entered shall provide for prompt entry of the order into the National Crime Information Center registry and shall provide for access of such orders to magistrates on a 24-hour-a-day basis. Modifications, terminations, renewals, and dismissals of the order shall also be promptly entered.

N.C. Gen. Stat. § 50B-3(d) (2011).

Not only must copies of the DVPO be served on the parties, but they also must be provided to "the police department of the city of the victim's residence" or "the sheriff, and the county police department, if any, of the county in which the victim resides" and the principal of child's school if the order requires the defendant to stay away from the child as well. N.C. Gen. Stat. § 50B-3(c). The obvious purpose of providing copies of the DVPO to law enforcement agencies, the school, and entry of the domestic violence order information into the National Crime Information Center database is to permit prompt and effective enforcement of the order by law enforcement agencies.

After holding that a TRO entered under Rule 65 was not a valid protective order entered under Chapter 50B, which was sufficient to dispose

of the issues presented by *Byrd*, the Supreme Court went on to note that the TRO was entered *ex parte* and thus was not entered "upon hearing by the court or consent of the parties"—another requirement under N.C. Gen. Stat. § 50B-1(c) not included under Rule 65 because no adversarial hearing at which the defendant had a right to be present was held prior to issuance of the TRO. *Id.* at 223-24, 675 S.E.2d at 328.

The issue of whether an *ex parte* order entered under § 50B-2(c) was a valid protective order and enforceable by N.C. Gen. Stat. § 50B-4.1 was not actually presented to the Supreme Court in *Byrd. See Byrd*, 363 N.C. at 221, 675 S.E.2d at 327 ("[E]ven if the TRO had been entered under Chapter 50B, which we have held it was not . . . ." (emphasis added)). It is unclear whether the portion of the Supreme Court's opinion addressing the *ex parte* nature of the proceedings could constitute an independent ground for its holding or not. *See Romulus*, ___ N.C. App. at ___, 715 S.E.2d at 321 ("[W]here a case actually presents two or more points, any one of which is sufficient to support decision, but the reviewing Court decides all the points, the decision becomes a precedent in respect to every point decided." (quoting *Hayes*, 243 N.C. at 536–37, 91 S.E.2d at 682)).

Given the fact that the case did not actually present the issue of an *ex parte* order entered pursuant to the detailed procedures in Chapter 50B and the lack of a due process analysis, we believe that the Supreme Court did not intend the *ex parte* and due process discussion as an independent ground for its holding. *See Central Virginia Community College v. Katz*, 546 U.S. 356, 363, 163 L.Ed. 2d 945, 954 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.").

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. *If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.* The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. State of Virginia*, 19 U.S. 264, 399-400, 5 L.Ed. 257, 290 (1821) (emphasis added). Therefore, we consider that discussion *obiter dicta*.

Second, if it is an independent ground and not *dicta*, that portion is nevertheless distinguishable from the present case because the 2009 amendments show that the Legislature disagreed with the Supreme Court's implication that an *ex parte* order is not a "valid protective order." Moreover, that discussion in *Byrd* only addressed N.C. Gen. Stat. § 50B-4.1, not § 3.1, which is at issue here.

We note that the Supreme Court emphasized the distinctive nature of the procedure and remedies provided under Chapter 50B:[2]

> Moreover, even if the TRO had been entered under Chapter 50B, which we have held it was not, it fails to meet the second prong of the definition of a valid domestic violence protective order in that it was not entered "upon hearing by the court or consent of the parties." N.C.G.S. § 50B-1(c). The State contends, and the Court of Appeals' majority agreed, that because an *ex parte* proceeding was held before the TRO was issued, the hearing requirement under N.C.G.S. § 50B–1(c) was satisfied. Again we disagree.
>
> The provisions of Chapter 50B demonstrate that in the domestic violence context, the Legislature contemplated two separate proceedings whereby two types of orders could be entered, a valid protective order and an *ex parte* order. N.C.G.S. §§ 50B–1(c), –2(c), –3(b) (2003). If exigent circumstances require immediate issuance, without notice to the other party, of an order to protect a party, the General Assembly has provided for an *ex parte* order. Under Chapter 50B when "[p]rior to the hearing, if it clearly appears to the court from specific facts shown, that there is a danger of acts of domestic violence against the aggrieved party ... the court may enter such orders as it deems necessary to protect the aggrieved party ... from such acts." N.C.G.S. § 50B–2(c). A trial court entering an *ex parte* order under this subsection is also required to hold a "hearing ... within 10 days from the date of issuance of the order or within seven days from the date of service of process on the other party, whichever occurs later." *Id.* By

---

2. Although this is the portion of the opinion we consider dicta, it does clarify the Supreme Court's view of the statutory procedure and importance of the definition of the various types of orders and is thus useful to our analysis. In addition, the due process analysis also depends upon the definition of "valid protective order" which was corrected by the 2009 statutory amendments.

definition a valid protective order must be upon hearing or by consent of the parties. N.C.G.S. § 50B–1(c). That the definition of a "protective order" permits entry of the order by consent also suggests that the enjoined party must have had notice with the opportunity to be heard. The record before this Court reveals that no such hearing was held by the trial court before it entered the TRO on 11 March 2004. A hearing was scheduled for 15 March 2004, but was continued, along with the TRO, until 24 March 2004. The order granting the TRO states that the "applicant's request for temporary restraining order comes on without notice to the Defendant." The circumstances surrounding its entry, as well as the language of the order itself, make clear that no hearing *of the type contemplated by N.C.G.S. § 50B–1(c)* was held in this case. Only a valid protective order entered under Chapter 50B can be used to enhance a defendant's sentence under N.C.G.S. § 50B–4.1(d).

*Id.* at 221-22, 675 S.E.2d at 327 (emphasis added).

Defendant relies upon *Byrd* in arguing that a "hearing" must be adversarial and that an *ex parte* hearing cannot be a "hearing" for purposes of N.C. Gen. Stat. § 50B-1(c). The Supreme Court noted that an *ex parte* hearing may be a type of hearing:

We acknowledge that the term "hearing" is often used generically to refer to any proceeding before a court. See Black's Law Dictionary 737 (8th ed. 2004) (defining a hearing as "[a] judicial session ... held for the purpose of deciding issues of fact or of law, sometimes with witnesses testifying"). We cannot, however, agree that this generic definition comports with the statutory scheme in Chapter 50B, which, in our view, requires that a defendant be given notice and the opportunity to be heard before entry of a protective order.

*Id.* at 222, 675 S.E.2d at 327-28.

*Byrd* is correct to the extent that it is read as stating that a defendant must be given notice and the opportunity to be heard before entry of a protective order for one year under N.C. Gen. Stat. § 50B-3, but to read it as eviscerating the *ex parte* protective provisions of Chapter 50B goes too far. The 2009 amendment to N.C. Gen. Stat. § 50B-4.1 added subsection (h): "For the purposes of this section, the term 'valid protective order' shall include an emergency or ex parte order entered

under this Chapter." 2009 N.C. Sess. Laws 342, § 5. This enactment was clearly in response to the *dicta* in *Byrd* indicating that an *ex parte* order may not be a "valid protective order" under § 50B-4.1. The legislature responded by providing that a "valid protective order" is not a special kind of order; it is simply an order which is valid under the particular statutory scheme. In other words, the statute as amended clarifies that a "valid protective order" is an order valid under whichever statute it falls, whether an *ex parte* order (N.C. Gen. Stat. § 50B-2(c)), an emergency order (N.C. Gen. Stat. § 50B-2(b)), or an order effective for one year (N.C. Gen. Stat. § 50B-3). To read it otherwise is to assume that the 2009 amendments were intended to draw an illogical distinction between a "protective order" and a "valid protective order."[3]

Section 50B-1(c) provides that "As used in this Chapter [50B], the term 'protective order' includes any order entered pursuant to this Chapter upon hearing by the court or consent of the parties." N.C. Gen. Stat. § 50B-1(c). The "hearing" at which the *ex parte* domestic violence protective order was entered in this case was exactly a "hearing *of the type contemplated* by N.C. Gen. Stat. § 50B-1(c)." *Byrd*, 363 N.C. at 222, 675 S.E.2d at 327 (emphasis added). Any reading of Chapter 50B otherwise entirely ignores the most relevant statutory provisions for purposes of this case.

This *ex parte* order was entered under N.C. Gen. Stat. § 50B-3.1, which provides as follows:

> (a) Required Surrender of Firearms. – **Upon issuance of an emergency or ex parte order pursuant to this Chapter**, the court shall order the defendant to surrender to the sheriff all firearms, machine guns, ammunition, permits to purchase firearms, and permits to carry concealed firearms that are in the care, custody, possession, ownership, or control of the defendant if the court finds any of the following factors:
>
> (1) The use or threatened use of a deadly weapon by the defendant or a pattern of prior conduct involving the use or threatened use of violence with a firearm against persons.
>
> (2) Threats to seriously injure or kill the aggrieved party or minor child by the defendant.

---

3. Indeed, the Supreme Court in Byrd used these two terms interchangeably. *See Byrd*, 363 N.C. at 222, 675 S.E.2d at 327.

(3) Threats to commit suicide by the defendant.

(4) Serious injuries inflicted upon the aggrieved party or minor child by the defendant.

(b) **Ex Parte or Emergency Hearing. — The court shall inquire of the plaintiff, at the ex parte or emergency hearing,** the presence of, ownership of, or otherwise access to firearms by the defendant, as well as ammunition, permits to purchase firearms, and permits to carry concealed firearms, and include, whenever possible, identifying information regarding the description, number, and location of firearms, ammunition, and permits in the order.

(c) Ten-Day Hearing. – The court, at the 10-day hearing, shall inquire of the defendant the presence of, ownership of, or otherwise access to firearms by the defendant, as well as ammunition, permits to purchase firearms, and permits to carry concealed firearms, and include, whenever possible, identifying information regarding the description, number, and location of firearms, ammunition, and permits in the order.

N.C. Gen. Stat. § 50B-3.1 (emphasis added).

This statute sets forth a specific procedure for entry of *ex parte* domestic violence orders which require surrender of firearms and directs what the court shall do at the *ex parte* hearing as well as at the ten-day hearing. This is the type of hearing contemplated under the statute because it is actually the procedure set forth by the statute and the statute refers to it as a "hearing." First, subsection (a) of the statute notes that surrender of firearms may be required in certain circumstances "upon issuance of an emergency or *ex parte order* pursuant to this Chapter." *Id.* Subsection (b) then goes on to direct the trial court to make certain inquiries *at either the emergency or ex parte hearing. Id.*

Defendant is correct that the *ex parte* hearing is not an adversarial hearing at which both parties are present, but that does not mean that it is not a "hearing" for purposes of N.C. Gen. Stat. § 50B-1(c), because N.C. Gen. Stat. § 50B-3.1(b) says that the *ex parte* hearing *is* such a hearing. Indeed, this Court has previously recognized that a "hearing" must be held prior to issuance of an *ex parte* protective order:

A court may only issue an ex parte DVPO if "it clearly appears to the court from specific facts shown, that

there is a danger of acts of domestic violence against the aggrieved party[.]" N.C. Gen. Stat. § 50B–2(c) (emphasis added). N.C. Gen. Stat. § 50B–2(c) does not provide that the trial court may issue an ex parte DVPO based solely upon the allegations of the complaint. N.C. Gen. Stat. § 50B–2(c) instead provides that

[i]f an aggrieved party acting pro se requests ex parte relief, the clerk of superior court shall schedule *an ex parte hearing* with the district court division of the General Court of Justice within 72 hours of the filing for said relief, or by the end of the next day on which the district court is in session in the county in which the action was filed, whichever shall first occur.

*Id.* (emphasis added).

Therefore, N.C. Gen. Stat. § 50B–2 requires that a "hearing" be held prior to issuance of the ex parte DVPO. *See id.* If the ex parte DVPO could be issued based only upon the verified complaint, without having the aggrieved party appear for a hearing before a judge or magistrate, there would be no need to schedule a hearing; the judge or magistrate could simply read the verified complaint and decide whether to issue the ex parte DVPO. *See id.* (footnote omitted)

*Hensey v. Hennessy,* 201 N.C. App. 56, 59-60, 685 S.E.2d 541, 544-45 (2009).

The trial court noted the statutory amendment to N.C. Gen. Stat. § 50B-4.1 following *Byrd* but concluded that it was inapplicable. The trial court further observed that although a "valid protective order" under N.C. Gen. Stat. § 50B-4.1 now explicitly includes *ex parte* orders, § 50B-3.1 does not because it uses the phrase "protective order"—omitting the word "valid". The trial court concluded that there is, therefore, a difference between a "protective order" and a "valid protective order." This interpretation ignores the plain words of N.C. Gen. Stat. § 14-269.8, which defines the crime of "Purchase or possession of firearms by person subject to domestic violence order," and § 50B-3.1.

*In accordance with G.S. 50B-3.1,* it is unlawful for any person to possess, purchase, or receive or attempt to possess, purchase, or receive a firearm, as defined in G.S. 14-409.39(2), machine gun, ammunition, or permits to purchase or carry concealed firearms if ordered by the court

for so long as that *protective order or any successive protective order* entered against that person *pursuant to Chapter 50B of the General Statutes* is in effect.

N.C. Gen. Stat. § 14-269.8 (emphasis added).

As indicated by the phrases emphasized above, N.C. Gen. Stat. § 14-269.8 refers to the provisions of Chapter 50B and relies upon any form of protective order entered under Chapter 50B, in particular § 50B-3.1. The limitation of "for purposes of this section" in N.C. Gen. Stat. § 50B-4.1 (h) clarifies the law following *Byrd* regarding what is a "valid protective order," to the extent that it may be read, incorrectly in our opinion, as holding that an *ex parte* DVPO is essentially unenforceable except by contempt of court because it is entered prior to an adversarial hearing.

Finally, the plain language of N.C. Gen. Stat. § 50B-3.1 makes clear that an emergency or *ex parte* order is a "protective order" for purposes of N.C. Gen. Stat. §§ 14-269.8 and 50B-3.1. Section 50B-3.1 addresses not only orders entered after the "ten-day hearing," but also emergency or *ex parte* orders. *See* N.C. Gen. Stat. § 50B-3.1(a) ("Upon issuance of an emergency or ex parte order . . . ."). In various subsections, the statute refers to the relevant order either as "the emergency or ex parte order," *e.g.,* N.C. Gen. Stat. § 50B-3.1(a), "the order," *e.g.,* N.C. Gen. Stat. § 50B-3.1(d) ("Upon service of the order . . . ."), or "the protective order," *e.g.,* N.C. Gen. Stat. § 50B-3.1(d)(1) ("If the court orders the defendant to surrender firearms, ammunition, and permits, the court shall inform the plaintiff and the defendant of the terms of the *protective order.*" (emphasis added)). Defendant would have us read these terms to mean different things.

The use of the term "protective order" in § 50B-3.1(d)(1) is particularly informative. N.C. Gen. Stat. § 50B-3.1(d) requires a defendant to surrender his firearms upon service of "the order" to that effect. N.C. Gen. Stat. § 50B-3.1(d) ("Upon service of the order . . ."). If the defendant does not have to surrender his firearms until service of "the order" and "the order" refers only to a "protective order" entered after a full hearing, there would be no point in requiring the court to order the surrender of firearms in an emergency or *ex parte* order when it finds one of the statutory factors. Therefore, the term "order" must include an *ex parte* order.

If we read "order" to include "emergency or *ex parte* order," then "protective order" must include those orders as well. Under subsection (d)(1) the court must inform the defendant of the terms of the "protective order" upon service of "the order." N.C. Gen. Stat. § 50B-3.1(d)(1). There is no reason to read the "order" referred to in subsection (d) as

different from that in subsection (d)(1). At the point an *ex parte* order is served on the defendant there has not been a full adversarial hearing. Therefore, if "protective order" means only an order entered after a full adversarial hearing, there would be no terms to inform the defendant of. This interpretation would render the statute illogical.

The most logical way to interpret the various provisions of § 50B-3.1 is to read "order" and "protective order" as including "emergency or ex parte order." N.C. Gen. Stat. § 50B-3.1(j) makes it a Class H felony to violate a court order directing the defendant to surrender his firearms "for so long as that protective order . . . is in effect." N.C. Gen. Stat. § 50B-3.1(j). That subsection cross-references N.C. Gen. Stat. § 14-269.8, which largely copies the language in § 50B-3.1(j) and criminalizes the violation of a protective order "entered against that person pursuant to Chapter 50B" requiring the surrender of firearms, "[i]n accordance with G.S. 50B-3.1." N.C. Gen. Stat. § 14-269.8(a). This particular statute refers specifically to § 50B-3.1, in which the proceeding before entry of an *ex parte* order is called a hearing and the term protective order includes *ex parte* orders.

In light of the 2009 amendments to Chapter 50B clarifying that a "valid protective order" includes *ex parte* orders and reading N.C. Gen. Stat. § 14-269.8(a) in conjunction with § 50B-3.1, we conclude that a "protective order" includes an *ex parte* or emergency order for purposes of N.C. Gen. Stat. §§ 14-269.8 and 50B-3.1.

### III. Procedural due process

**[2]** The trial court concluded and defendant argues that prosecution of defendant for violation of the *ex parte* order would infringe his right to due process of law under the state and federal constitutions. We hold that these provisions fully comply with procedural due process requirements as applied to defendant.[4]

The Fourteenth Amendment to the United States Constitution forbids states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[T]he Law of the Land Clause of the North Carolina Constitution, N.C. Const. art. I, § 19, is synonymous with due process of law as found in the Fourteenth

---

4. Although the trial court did not specify how it believed enforcement of an *ex parte* order would violate defendant's due process rights, the parties only briefed the issue of procedural, not substantive, due process. Therefore, we only address procedural due process.

Amendment to the Federal Constitution." *State v. Bryant*, 359 N.C. 554, 563, 614 S.E.2d 479, 485 (2005) (citation and quotation marks omitted).

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 47 L.Ed. 2d 18, 32 (1976) (citation and quotation marks omitted). Generally, due process requires notice and a hearing before the government may deprive an individual of liberty or property. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53, 126 L.Ed. 2d 490, 503 (1993).

> The right to prior notice and a hearing is central to the Constitution's command of due process. . . . We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.

*Id.* (citations and quotation marks omitted). In *Mathews*, the United States Supreme Court announced a balancing test for deciding questions of procedural due process that it has since described as follows:

> [T]he process due in any given instance is determined by weighing the private interest that will be affected by the official action against the Government's asserted interest, including the function involved and the burdens the Government would face in providing greater process. The *Mathews* calculus then contemplates a judicious balancing of these concerns, through an analysis of the risk of an erroneous deprivation of the private interest if the process were reduced and the probable value, if any, of additional or substitute procedural safeguards.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 159 L.Ed. 2d 578, 509 (2004) (citations and quotation marks omitted).

In applying the Law of the Land Clause to the deprivation of a property or liberty interest prior to notice and a hearing, our Supreme Court has articulated a slightly different test under the North Carolina Constitution:

> When the furtherance of a legitimate state interest requires the state to engage in prompt remedial action adverse to an individual interest protected by law and the action proposed by the state is reasonably related to furthering the state interest, the law of the land ordinarily requires no more than that before such action is undertaken, a judicial

officer determine there is probable cause to believe that the conditions which would justify the action exist.

*Henry v. Edmisten,* 315 N.C. 474, 494, 340 S.E.2d 720, 733 (1986).

Here, defendant asserts two distinct liberty interests, though he does not distinguish them: first, his right to keep and bear arms, which he alleges is infringed by enforcement of the order requiring surrender of his firearms; second, his physical liberty, which he implies is infringed by his prosecution for violation of an *ex parte* order, as opposed to merely being subject to contempt sanctions.

The *dicta* in *Byrd* that the trial court relied on did not mention the balancing test for procedural due process under the Fourteenth Amendment, identify the interests at stake, or purport to balance those interests. *Byrd,* 363 N.C. at 223-24, 675 S.E.2d at 328.[5] The Supreme Court's failure to address these issues is an additional indication that its statements on this issue were *dicta,* and as noted above, we conclude this *dicta* is not controlling.

The right to keep and bear arms is a fundamental right protected by the Second Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment. *McDonald v. City of Chicago, Ill.,* ___ U.S. ___, ___, 177 L.Ed. 2d 894, 921 (2010). The State has not asserted that defendant is a convicted felon or otherwise in a class of people who do not have a liberty interest in possessing firearms. *See generally Johnston v. State,* ___ N.C. App. ___, 735 S.E.2d 859 (2012), *writ of supersedeas granted,* ___ N.C. ___, 738 S.E.2d 360 (2013). We assume for the purpose of the procedural due process analysis, without deciding, that an *ex parte* order that forbids a defendant from possessing firearms and subjects him to criminal prosecution or contempt sanctions for violation of that order deprives him of his right to keep and bear arms. Thus, we will proceed to consider the constitutional adequacy of the procedures at issue.

"[T]he degree of potential deprivation that may be created by a particular decision is a factor to be considered . . . ." *Mathews,* 424 U.S. at 341, 47 L.Ed. 2d at 37. In particular, "the possible length of wrongful deprivation . . . is an important factor in assessing the impact of official action on the private interests." *Id.* (citation and quotation marks omitted).

The degree of deprivation of that interest in this case is fairly minor because it is temporary and the period of deprivation prior to the full

---

5. This is not surprising, as neither party addressed due process issues in their briefs before the Supreme Court in *Byrd.*

hearing is extremely short. After the entry of an *ex parte* DVPO, the trial court must hold a hearing at which a defendant may appear within ten days of the issuance of the order or within seven days of service on the defendant, though it may be held sooner. N.C. Gen. Stat. § 50B-2(c). Here, the hearing was scheduled for six days after the *ex parte* order was issued and three days after the order was served on defendant.

Additionally, there is not a substantial risk of erroneous deprivation. To enter an *ex parte* order, the trial court must find that "it clearly appears to the court from specific facts shown, that there is a danger of acts of domestic violence against the aggrieved party or a minor child." N.C. Gen. Stat. § 50B-2(c). For a trial court to order a defendant to surrender his firearms upon an emergency or *ex parte* order, it must find one of the following factors:

1) The use or threatened use of a deadly weapon by the defendant or a pattern of prior conduct involving the use or threatened use of violence with a firearm against persons.

2) Threats to seriously injure or kill the aggrieved party or minor child by the defendant.

3) Threats to commit suicide by the defendant.

4) Serious injuries inflicted upon the aggrieved party or minor child by the defendant.

N.C. Gen. Stat. § 50B-3.1(a).[6] These findings may be made at an *ex parte* hearing, but are not simply based on the aggrieved party's written statement in the complaint. *See Hensey*, 201 N.C. App. at 60, 685 S.E.2d at 545.

At the ten-day hearing, someone accused of domestic violence would have the opportunity to present evidence and confront the evidence against him. If the court does not enter another protective order when the *ex parte* or emergency order expires, a defendant can retrieve his firearms unless he is otherwise precluded by law from owning them. N.C. Gen. Stat. § 50B-3.1(e). Additionally, after final disposition of pending criminal charges, the accused would be again able to possess firearms and he may move for the return of his firearms. N.C. Gen.

---

6. The trial court that entered the *ex parte* order here found that defendant had threatened to commit suicide. Although defendant claims that the trial court did not have a sufficient basis for this finding, he did not appeal from the *ex parte* order and we have no jurisdiction to rule upon that order.

Stat. § 50B-3.1(f). When served with the *ex parte* order, a defendant is informed of both the potential penalties for violations of the order and instructed how he may request the return of his firearms. N.C. Gen. Stat. § 50B-3.1(d)(1).

> [W]hen prompt postdeprivation review is available for correction of administrative error, [the Supreme Court has] generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be.

*Mackey v. Montrym*, 443 U.S. 1, 13, 61 L.Ed. 2d 321, 331 (1979). The DVPO statutes as outlined above provide such a reasonably reliable basis for temporarily depriving a defendant of his firearms. Thus, the risk of any erroneous deprivation of a defendant's Second Amendment rights would be minimal.

The government's interest in this case is clear—the protection of domestic violence victims and preventing domestic violence from escalating to murder.[7] Defendant concedes that this is a "significant interest," but argues that that particular interest is not advanced by the *prosecution* of someone for the violation of the firearms provision of a DVPO. This argument is unconvincing.

An *ex parte* order would be of limited use if the violation of a provision forbidding the possession of a firearm could not be prosecuted. The Legislature has decided that potential violations of an *ex parte* order's firearm provisions are sufficiently serious to warrant criminal prosecution and not simply the threat of contempt sanctions. We cannot say that this choice is unreasonable or unjustified given the extraordinary potential for violence in the period between entry of an *ex parte* order and a full hearing, especially when firearms are present. It is reasonable for the Legislature to find that the threat of criminal penalty may be more effective deterrence than the threat of contempt sanctions.

---

7. N.C. Gen. Stat. § 114-2.7 (2011) requires the Attorney General to file annual reports on domestic violence homicides with the Joint Legislative Committee on Domestic Violence. The Attorney General's most recent report indicates that there were 122 domestic violence related homicides in North Carolina last year. N.C. Dep't of Justice, Report on Domestic Violence Related Homicides Occurring in 2012 2 (2013), *available at* http://www.ncdoj.gov/Help-for-Victims/Domestic-Violence-Victims/Domestic-Violence-Statistics.aspx.

If a defendant believes that the *ex parte* order itself is unjustified, he can fully contest the issue less than two weeks after he is deprived of his firearms. The State's interest is not simply in protecting victims of domestic violence generally, but *effectively* protecting them at the point that the prosecuting witness first confronts her abuser through legal means. This interest is undeniably valid and important. Additional procedural safeguards, such as requiring a fully contested hearing before forbidding someone subject to an *ex parte* order from possessing firearms, would prevent the State from protecting victims of domestic violence at a time that those protections are most required. There is no way to protect victims of domestic violence that would provide a predeprivation hearing during the crucial period between service of the *ex parte* order and the ten-day hearing.

We hold that this situation is one of those "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after" the deprivation, *James Daniel Good Real Property*, 510 U.S. at 53, 126 L.Ed. 2d at 503 (citation and quotation marks omitted), and conclude that the provisions of N.C. Gen. Stat. §§ 50B-2(c) and 50B-3.1 are constitutional as applied to defendant under the Fourteenth Amendment.

For these same reasons, furtherance of the legitimate state interest in immediately and effectively protecting victims of domestic violence requires "the state to engage in prompt remedial action adverse to an individual interest protected by law and the action proposed by the state is reasonably related to furthering the state interest." *Henry*, 315 N.C. at 494, 340 S.E.2d at 733. An *ex parte* order may only be granted "if it clearly appears to the court from specific facts shown, that there is a danger of acts of domestic violence against the aggrieved party or a minor child . . . ." N.C. Gen. Stat. § 50B-2. Additionally, to order a defendant to surrender his firearms, the court must find one of the statutory factors justifying that action. N.C. Gen. Stat. § 50B-3.1(a). Therefore, we hold that an order requiring the surrender of firearms after an *ex parte* hearing under Chapter 50B is also constitutional under the Law of the Land Clause of the North Carolina Constitution. *See Henry*, 315 N.C. at 494, 340 S.E.2d at 733; *Mackey*, 443 U.S. at 13, 61 L.Ed. 2d at 331.

Defendant implies that using criminal punishment rather than contempt sanctions to enforce an *ex parte* order infringes on his fundamental right to physical liberty without due process. Neither defendant nor the *dicta* in *Byrd* he relies on gives any reason that the enforcement of

such an order by criminal punishment would violate his right to due process while punishment by contempt sanctions would not.

Where a court punishes a party for violation of a past order, a contempt sanction is normally considered criminal contempt, rather than civil, which is usually used to force compliance with an order. *O'Briant v. O'Briant,* 313 N.C. 432, 434, 329 S.E.2d 370, 372 (1985); *see Hodges v. Hodges,* 156 N.C. App. 404, 406, 577 S.E.2d 121, 123 (2003) (considering use of criminal contempt to punish violation of a DVPO). Both criminal sanctions under N.C. Gen. Stat. § 14-269.8 and criminal contempt under N.C. Gen. Stat. § 5A-11(a)(3) (2011) (willful disobedience of a court order) carry the possibility of confinement. *See* N.C. Gen. Stat. § 5A-12(a) (2011) (providing for imprisonment of up to thirty days for criminal contempt). We see no reason why imprisoning a defendant for failing to comply with the order under § 14-269.8 would violate his right to due process more than jailing him under the criminal contempt statute. *See O'Briant,* 313 N.C. at 435, 329 S.E.2d at 373 (noting that "criminal contempts are crimes, and accordingly, the accused is entitled to the benefits of all constitutional safeguards.").

The provisions of N.C. Gen. Stat. § 50B-3.1 only apply once the defendant is served with the order by the sheriff. *See* N.C. Gen. Stat. § 50B-3.1(d). Thus, a defendant charged under § 14-269.8 is not unaware of the order. A defendant is given notice that he must surrender his firearms and is informed of the potential penalties for failing to do so. N.C. Gen. Stat. § 50B-3.1(d)(1). If charged with violating the order under N.C. Gen. Stat. § 14-269.8, he is given the same procedural protections as any other criminal defendant, and indeed, the same procedural protections as he would if he faced a criminal contempt sanction. *See O'Briant,* 313 N.C. at 435, 329 S.E.2d at 373. Therefore, defendant's interest in physical liberty is adequately protected by N.C. Gen. Stat. § 14-269.8 and prosecution for violation of the *ex parte* order gives him all the process he is due.

Thus, there is no reason that defendant's prosecution for violation of the *ex parte* order might infringe his procedural due process rights other than the fact that it was entered prior to notice and an opportunity to be heard. As discussed above, the exigencies of the domestic violence context justify the use of a postdeprivation hearing as to that order. Thus, we hold that criminal prosecution for violation of an *ex parte* order requiring the surrender of defendant's firearms does not violate his due process rights.                                                    __

IV. Conclusion

For the foregoing reasons, we conclude that an *ex parte* order is a "protective order" for purposes of N.C. Gen. Stat. §§ 14-269.8 and 50B-3.1. Additionally, we hold that the prosecution of defendant for violation of the *ex parte* order does not violate his procedural due process rights. Therefore, we reverse the trial court's order dismissing the indictment and remand for further proceedings.

REVERSED and REMANDED.

Judges ELMORE and STEELMAN concur.